IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ASARCO, LLC, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 1:12-CV-137 |
| | § | |
| MONTANA RESOURCES, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Before the Court is Defendants Montana Resources, Inc. and Montana Resources, LLP's Post-Discovery Motion for Summary Judgment [Doc. Nos. 282 (redacted version) & 284 (filed under seal)]. Plaintiffs ASARCO, LLC and ASARCO Master, Inc. filed their Response and Opposition [Doc. No. 288], and Defendants have filed their Reply in Support [Doc. No. 292]. For the following reasons, the Court hereby **DENIES** Defendants' Post-Discovery Motion for Summary Judgment on all grounds.

### I. BACKGROUND

In its previous Summary Judgment Opinion [Doc. No. 227], the Court provided a comprehensive history of this case. The Court partially reproduces this history below as sections (I)(A)–(C) and (II)(A).

#### A. The Partnership History

On May 31, 1989, AR Montana Corporation (hereinafter "AR Montana"), the alleged predecessor to ASARCO Master, Inc. (hereinafter "ASARCO Master") and a special purpose subsidiary of ASARCO, LLC, entered into a Partnership Agreement with Montana Resources, Inc. (hereinafter "MRI") to create Montana Resources, a general partnership. [Doc. Nos. 46 ¶ 1; 176 at

3]. Montana Resources operated and developed certain mining facilities in Butte, Montana. [Doc. No. 282-1 at 16–17]. MRI initially possessed a 50.1% interest in the partnership, while AR Montana received the remaining 49.9%. [*Id.* at 18].

According to the terms of the Agreement, the partners would be liable for "Cash Calls," if necessary, to cover the partnership's expenses. If one of the partners did not pay a Cash Call when due and failed to remedy the nonpayment within 30 days, it would be in default. Additionally, the filing of a bankruptcy petition was an event of default. The contract terms provided that, in relevant part,

> 11. <u>Event of Default.</u> An event of default ("Event of Default") exists if any of the following occurs or continues beyond any period of time provided for cure: [1]
>> (a) A Partner fails to meet a Cash Call as required pursuant to the terms of this agreement when due and such failure to pay the required Cash Call is not cured within thirty days after notice from the Partnership by payment of the full amount due, together with interest paid at the Overdue Rate.
>> . . .
>> (d) The filing of a voluntary petition by a Partner or the filing of an involuntary petition against a Partner that is not discharged within thirty days, under any bankruptcy or insolvency law.

[Doc. No. 282-1 at 40–41]. Under the contract, "[u]pon the occurrence of an Event of Default" the defaulting partner would lose the "right to participate in the management and control of the Partnership," voting rights, and income and cash distributions from the Partnership "until a Reinstatement or cure has occurred." [*Id.* at 41].

The Agreement also allowed for the dilution of a partner's interest if a partner defaulted with respect to the payment obligations. [*Id.*]. The Non-Defaulting Partner had three remedies it could pursue "at any time during the Event of Default and prior to Reinstatement or cure." [*Id.*]. They were:

> (i) The Non-Defaulting Partner may decline to act and the Defaulting Partner shall be deemed to be, and to remain, in default until the Non-Defaulting Partner shall

---

[1] The Court could not find a specific "period of time provided for cure" in the Partnership Agreement.

waive such default in writing;

(ii) The Non-Defaulting Partner may transfer an amount adequate to cover the deficit amount of the Cash Call and:

(A) deem such transfer to constitute an advance to the Defaulting Partner of such deficit amount, which advance shall not cure the Event of Default;

(B) deem such transfer to constitute a cure of the Event of Default and reduce the Partnership Interest of the Defaulting Partner by 1.0% for each $100,000 of capital the Defaulting Partner failed to contribute, in which event, the rights of the Defaulting Partner to exercise voting power and to receive distributions shall be subject to dilution hereunder ("Dilution"), except that the Defaulting Partner shall reimburse and indemnify the Non-Defaulting Partner for and against any and all Capital Account deficits, liabilities (environmental or otherwise), obligations, losses (operating or otherwise), damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements of whatsoever kind or nature that may be imposed on, asserted against or incurred by the Non-Defaulting Partner or the Partnership in any way relating to or arising out of events prior to the date its Partnership Interest was Diluted, which reimbursement or indemnity may be apportioned to the largest Partnership Interest to which the Defaulting Partner was entitled prior to the Default; or

(iii) The dissolution of the Partnership . . .

[*Id.* at 42–43]. Additionally, the reinstatement provision provided:

12.02 <u>Reinstatement.</u> In the event that a Non-Defaulting Partner shall elect that the Defaulting Partner shall be deemed to be in default pursuant to Section 12.01(a) or Section 12.01(b)(i), the Defaulting Partner may cure such default by contributing all amounts owed, plus interest at the Overdue Rate, to the Non-Defaulting Partner and the Partnership, which repayment shall constitute reinstatement ("Reinstatement"). After Reinstatement, such Partner (a "Reinstated Partner") (a) shall possess the voting power on the Committee that it held with respect to its lowest Partnership Interest prior to the failure to pay a Cash Call and (b) shall be entitled to receive cash distributions and other income allocations in proportion to the lowest Partnership Interest that it held prior to the failure to pay a Cash Call.

[*Id.* at 43]. The references above in Section 12.02 to "Section 12.01(a) or Section 12.01(b)(i)" were incorrect—Section 12.01(a) does not refer to deeming a partner to be in default and Section 12.01(b)(i) does not exist. [*Id.*]; [Doc. No. 292-1 at 205:5–18]; [Doc. No. 180-4 at 128:9–129:12]. From October 2002 to December 2003, AR Montana suffered successive defaults on its Cash Call obligations until its voting and distribution rights were diluted to 0% on December 9, 2003. [Doc. Nos. 46 ¶¶ 12–15; 169-12]. Plaintiffs claim that once their rights were reduced to 0%, MRI

"purported to dissociate" AR Montana from Montana Resources. [Doc. No. 46 ¶ 16]. At that time, MRI entered into a "Second Amended and Restated Partnership Agreement" for "Montana Resources, LLP f/n/a Montana Resources" with a new partner, MR Holdings, LLC. [Doc. No. 197 at 1–2]. The Agreement specified that it was "continu[ing] a partnership" that would become "Montana Resources, LLP" upon registration with the Montana Secretary of State. [*Id.* at 5]. The Montana Secretary of State registered Montana Resources, LLP (hereinafter, "MRLLP") on January 8, 2004. [Doc. No. 170-10].

## B. The Bankruptcy Proceedings

AR Montana allegedly merged into ASARCO Master in 2005. [Doc. No. 46 ¶ 18]. Later that year, ASARCO, LLC and its affiliates, including ASARCO Master, filed voluntary bankruptcy petitions in the United States Bankruptcy Court for the Southern District of Texas (the "underlying bankruptcy case"). [*Id.*]; *In re ASARCO, LLC*, No. 05-21207, 2009 WL 8176641 (Bankr. S.D. Tex. Jun. 5, 2009).[2] During the pendency of the bankruptcy proceedings, MRI[3] filed Proofs of Claim for over $38 million requesting that ASARCO, LLC and ASARCO Master reimburse MRI for: costs related to compliance with a Consent Decree between the partnership, the United States, and the State of Montana for environmental damage related to the mine;[4] costs related to Butte Mine operating permits; and "Natural Resource Damages."[5] [Doc. No. 194, Ex.

---

[2] Thus, AR Montana defaulted under Section 11(a), and, after the alleged merger with ASARCO Master, ASARCO Master arguably defaulted under Section 11(d) of the Partnership Agreement.

[3] For purposes of the pending motions, the Court treats the representations made by MRI in the Proofs of Claim as if they were made by all Defendants in the present suit since Montana Resources LLP is arguably a successor to MRI.

[4] "The United States and the State of Montana asserted claims against MR, MRI, ASARCO and AR Montana Corporation (now AMI) under Section 106, 107 and 113(g)(2) of the Comprehensive Environmental Response Compensation and Liability Act and the Montana Comprehensive Environmental Cleanup and Responsibility Act, seeking the performance of response costs with respect to the Butte Mine Flooding Operable Unit of the Silver Bow Creek/Butte Area National Priorities List Site, including the Berkeley Pit, which contains over 30 billion gallons of acidic mine waters. . . . In March 2002, the United States and the State of Montana entered into a Consent Decree for the Butte Mining Flooding Operable Unit with a number of parties including ARCO, MR, MRI, ASARCO and AR Montana Corporation (now AMI)." [Doc. No. 194, Ex. 16 at 17].

[5] ASARCO "contends that MR is liable to it in contribution with respect to a settlement that ARCO[/ASARCO] entered into with the State of Montana, the Confederated Salish and Kootenai Tribes and the United States resolving

16 at 2, 14]. Plaintiffs (Debtors) initiated an Adversary Proceeding against MRI. The primary

allegations that Plaintiffs made included fraudulent transfer, breach of contract, and improper

expulsion claims. [Pls.' Compl. & Objection to Proofs of Claim Filed by Mont. Res., Inc., Adv.

No. 07-02024, Doc. No. 1]. By agreement, that proceeding was subsequently dismissed with

prejudice, and no party reserved any claims or waived any rights. [Stipulation & Order Allowing

Claims of Mont. Res., Inc. & Dismissing Adversary Proceeding, Adv. No. 07-02024, Doc. No.

212]. The bankruptcy court signed a Stipulation and Order on August 25, 2009, accepting MRI's

Proofs of Claim and confirming a settlement agreement between the parties. [*Id.*]. The Stipulation

and Order in relevant part reads,

> 2. The MRI Past Costs Claim, the MRI Future Remediation Claim and the MRI
> Natural Resources Damages Claim (the "2007 Settled Claims") are allowed in the
> aggregate amount of $18,779,255;
> 3. The MRI Future Reclamation Claims (the "2009 Settled Claim", and together
> with the 2007 Settled Claims, the "MRI Settled Claims") is allowed in the amount
> of $20,000,000.

[*Id.*]. Soon thereafter, the underlying bankruptcy case concluded. *In re ASARCO, LLC*, 420 B.R.

314 (S.D. Tex. 2009). No party presented to either the bankruptcy court at the time or to this Court

a written settlement agreement or release, and no party now claims that one controls the current

proceeding.

## C. The Reinstatement Letter

On November 15, 2011, approximately two years after the conclusion of the Adversary

Proceeding and the issuance of the Bankruptcy Plan Confirmation Order, Plaintiffs sent

---

claims under the Comprehensive Environmental Response Compensation and Liability Act and the Montana
Comprehensive Environmental Cleanup and Responsibility Act for alleged damages to natural resources in the Clark
Fork River Basin. Under that settlement (the "NRD Settlement"), ARCO [*sic*] paid the plaintiffs a total of $212.5
million. ARCO [*sic*] contends that the operation of the Butte Mine by MR contributed to the damages to natural
resources that had been asserted by the State, the United States and the Tribes and that MR is liable in contribution
for certain of those costs." [Doc. Nos. 194, Ex. 16 at 2, 14].

Defendants a letter invoking an alleged right to reinstatement into MRLLP. [Doc. No. 192 at 28–29]. Plaintiffs fully tendered the amount that they believed they owed the partnership pursuant to their reading of the Reinstatement Provision for the 2002-2003 Cash Call defaults. [*Id.*]. Plaintiffs additionally notified MRI that they would give MRI five days to accept the tender or consent to accepting it and would consider MRI's lack of compliance with their demand to be a breach of the Partnership Agreement and commence suit. [*Id.*]. Defendants neither accepted the tender nor responded. [Doc. No. 46 ¶ 22].

## II. PROCEDURAL HISTORY

### A. Prior Motion for Summary Judgment

Plaintiffs initiated this suit in the United States District Court for the District of Montana approximately two and a half weeks after their stated deadline expired. [Doc. No. 1]. Afterwards, they filed their First Amended Complaint ("Complaint"). [Doc. No. 46]. In it, they asserted that Defendants breached the Partnership Agreement by failing to accept Plaintiffs' tender and reinstate them into the partnership. [*Id.* ¶ 22]. Defendants filed a Motion to Dismiss claiming that Plaintiffs lacked standing to bring the case and were barred by res judicata and judicial estoppel from bringing all claims that existed before the bankruptcy but were undisclosed in the bankruptcy. [Doc. No. 78 at 2–3]. The case was transferred to this Court by the United States District Court for the District of Montana. [Doc. No. 57]. Subsequently, this Court ruled on Defendants' Motion to Dismiss. [Doc. No. 104]. In summary, it ruled that all claims that existed pre-bankruptcy were barred, but that the breach of the contractual reinstatement claim had not accrued before the bankruptcy. *ASARCO, LLC v. Mont. Res., Inc.*, 514 B.R. 168, 179 (S.D. Tex. 2013). Consequently, the breach of contract suit solely based upon that provision could continue. The only remaining claims therefore are based on the November 2011 alleged breach of contract, for which Plaintiffs

request declaratory and equitable relief. [Doc. No. 46 ¶¶ 24–31].

Defendants then filed an Amended Motion for Summary Judgment, alleging different theories upon which summary judgment should be granted: (1) two different statutes of limitations bar the current suit; (2) the breach of contract claim existed pre-bankruptcy so Plaintiffs lack standing to bring it and are barred by res judicata and judicial estoppel from asserting it now; (3) Plaintiffs were never partners in MRLLP and so cannot assert a right to reenter into it; (4) the general partnership known as "Montana Resources" was dissolved and thus no longer exists; (5) ASARCO Master lacks standing to assert a claim because the Supplemental Confirmation Order required ASARCO, LLC to wind down ASARCO Master; (6) the Partnership Agreement's terms unambiguously lack a right to reinstatement after cure; and (7) in the alternative, if a right to reinstatement exists, the contract language only allows Plaintiffs to reinstate into their lowest percentage interest of 1.23%. [Doc. No. 176 at i–ii].

This Court issued an opinion granting in part and denying in part Defendants' first Motion for Summary Judgment [Doc. No. 227]. The Court denied summary judgment on all grounds[6] except the limitation on the percentage of Partnership Interest into which Plaintiffs could potentially reenter.

The Court certified the case for interlocutory appeal. [Doc. No. 228]. The parties appealed the Court's Summary Judgment Opinion, and the Fifth Circuit affirmed this Court's decision. *ASARCO, L.L.C. v. Montana Res., Inc.*, 858 F.3d 949 (5th Cir. 2017). In the opinion, the panel held that claim preclusion did not bar the breach of contract claim and that the Court did not abuse

---

[6] The Court denied summary judgment based upon the following issues: Plaintiffs lacked standing or were barred by the statute of limitations, and whether the contract rode through bankruptcy. The Court also held that the Partnership Agreement is ambiguous as a matter of law and there is a genuine issue of material fact whether a right to reinstatement exists.

its discretion where it did not judicially estop Plaintiffs from bringing suit. *Id.* at 952. The Fifth Circuit declined to address whether the right to reinstatement "rode through" the bankruptcy. *Id.*

## B. Pending Motion for Summary Judgment

The Defendants filed their Post-Discovery Motion for Summary Judgment, alleging three new grounds for summary judgment. [Doc. No. 284].

First, Defendants argue that "neither Plaintiff [ASARCO Master or ASARCO, LLC] had any actual rights to assert when they sent the November 15, 2011 letter demanding reinstatement" because ASARCO, LLC has never been a partner under the Agreement. [Doc. No. 284 at 4]. Defendants argue that ASARCO Master did not obtain rights from its predecessor for two reasons: AR Montana did not seek MRI's consent to transfer its rights to ASARCO Master, a requirement under the Agreement and under Montana partnership law, and neither AR Montana nor ASARCO Master complied with the prerequisites for transfer under the Partnership Agreement, so any purported transfer was invalid. [Doc. No. 284 at 4]. Further, Defendants allege that ASARCO Master was wound down according to the terms of the Bankruptcy Plan and that wound-down entities cannot receive assets post-bankruptcy. [*Id.* at 25].

Defendants also allege that when ASARCO Master filed for bankruptcy, it defaulted under Section 11(d) of the Agreement; thus, even if the Court permitted Plaintiffs to cure the Cash Calls, Defendants allege that default under Section 11(d) is incurable and would still prohibit Plaintiffs' reinstatement. [*Id.*]. Last, Defendants contend that two newly discovered drafts of the Partnership Agreement make the meaning of the default clause "clear and unambiguous" and compel a judgment in their favor as a matter of law. [*Id.*].

The Court will address each of these arguments in turn.

# III. STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the nonmovant to show that the Court should not grant the motion. *Celotex Corp.*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255.

# IV. DISCUSSION

## A. ASARCO, LLC and ASARCO Master's Rights Pre- and Post-Bankruptcy

Defendants argue that neither ASARCO, LLC nor ASARCO Master has ever held an interest in the Montana Resources Partnership and therefore cannot be reinstated under the Partnership Agreement. [Doc. No. 284 at 4]. Defendants claim that ASARCO, LLC was simply never a partner under the Agreement and that if it was never a partner, it had no grounds for reinstatement when it sent the November 2011 demand letter. [*Id.*]. Defendants also claim that "ASARCO Master never actually succeeded to its predecessor-in-interest's rights under the Agreement because it never satisfied the terms of the Agreement" and because "ASARCO Master

was wound down, under the terms of the [bankruptcy] Plan." [*Id.*]. If either proposition is true, then ASARCO Master would be barred from recovery as a matter of law.

### i. *ASARCO, LLC's Rights Pre-Bankruptcy*

Turning first to ASARCO, LLC's pre-bankruptcy rights, Plaintiffs provide evidence that Defendants admitted in the bankruptcy proceedings that ASARCO, LLC was a party to the Partnership Agreement. [Doc. No. 194, Ex. 16 at 3]. Plaintiffs claim that Defendants' "Proof of Claim of Montana Resources, Inc. Against ASARCO LLC" demonstrates that Defendants sought to hold ASARCO, LLC liable under the Partnership Agreement and therefore have admitted that ASARCO, LLC has rights under the Partnership Agreement. [*Id.*]. In their Proof of Claim, Defendants stated:

> This claim arises from the operations of a partnership, Montana Resources, *in which both MRI and ASARCO LLC previously held general partnership interests*, and that owned and operated a copper mine in Butte, Montana (the "Butte Mine"). *Pursuant to* agreements relating to or arising from the ownership and operation of the Butte Mine, MRI has incurred, will incur, or may be required to incur, costs, expenses, liabilities and obligations for which *ASARCO LLC is legally and contractually required to reimburse MRI*. . . . ASARCO Incorporated, which is now known as ASARCO LLC, debtor herein ("ASARCO") . . . *Pursuant to Section 12.01(d)(ii)(B) of the Partnership Agreement, ASARCO is liable to, and required to indemnify MRI for, the existing liabilities, obligations and other responsibilities of MR based on the largest partnership share that ASARCO held in MR.*

[Doc. No. 194, Ex. 16 at 3–4] (emphasis added). Plaintiffs claim that when Defendants sought damages from ASARCO, LLC during the bankruptcy proceedings, they admitted that ASARCO, LLC was a party to the Partnership Agreement. [Doc. No. 288 at 17 n.9]. Additionally, Plaintiffs point out that Defendants received $38,779,255 as a result of their claims against ASARCO, LLC. [*Id.*]. Now that ASARCO, LLC seeks damages from Defendants, Plaintiffs argue that Defendants cannot make claims that are contrary to their previous filings; and accordingly, these claims are "barred by waiver, estoppel and judicial estoppel." [Doc. No. 288 at 19].

Plaintiffs do not provide case law to support their assertion that Defendants are estopped from claiming that ASARCO, LLC has no rights to the Partnership Agreement; as such, the Court pauses here to describe the doctrines of waiver, estoppel and judicial estoppel. Waiver "is the voluntary or intentional relinquishment of a known right." *Pitts ex rel. Pitts v. Am. Sec. Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir. 1991) (citing *Gen. Elec. Supply Co. v. Utley-James of Tex., Inc.*, 857 F.2d 1010, 1013 n.1 (5th Cir. 1988)). In other words, the doctrine of waiver may only be applied where a party has knowingly forfeited the right to assert an argument or a defense. *See Gen. Elec.*, 857 F.2d at 1013. Estoppel, on the other hand, arises when "one party has reasonably relied on the conduct or statements of another; if the relying party suffers harm as a result of this reliance, the inducing party can be estopped from disavowing his earlier conduct or statement." *Salzstein v. Bekins Van Lines, Inc.*, 993 F.2d 1187, 1191 (5th Cir. 1993) (first citing *Bennett v. Allstate Ins. Co.*, 950 F.2d 1102, 1107–08 (5th Cir. 1992); and then citing *Pitts*, 931 F.2d at 357). "In contrast to waiver, then, estoppel involves some element of reliance or prejudice on the part of the" complaining party. *Pitts*, 931 F.2d at 357. Relatedly, the doctrine of judicial estoppel prevents parties from "asserting a position in a legal proceeding that is contrary to a position previously taken" in either the same or an earlier proceeding. *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (quoting *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996)). Two bases of judicial estoppel must be satisfied before applying the doctrine. *Hall*, 327 F.3d at 396. The doctrine may be applied only where (1) "the position of the party to be estopped is clearly inconsistent with its previous one" and (2) that party has "convinced the court to accept that previous position." *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 833 (5th Cir. 2000).

Although failing to go through the analysis, Plaintiffs contend that Defendants are judicially estopped from claiming that ASARCO, LLC has no rights under the Agreement because

(1) during the bankruptcy proceedings, Defendants sought damages from ASARCO, LLC, claiming that it owed money due to its partnership obligations and (2) Defendants received $38,779,255 as a result of their claims against ASARCO, LLC. [Doc. Nos. 194, Ex. 16 at 3; 288 at 17 n.9]. Upon review of the record and evidence submitted by the parties, the Court acknowledges that the bankruptcy court signed a Stipulation and Order on August 25, 2009, accepting Defendants' Proofs of Claim and confirming a settlement agreement between the parties. [Adv. No. 07-02024, Doc. No. 212]. The Stipulation and Order in relevant part reads:

> 2. The MRI Past Costs Claim, the MRI Future Remediation Claim and the MRI Natural Resources Damages Claim (the "2007 Settled Claims") are allowed in the aggregate amount of $18,779,255;
> 3. The MRI Future Reclamation Claims (the "2009 Settled Claim", and together with the 2007 Settled Claims, the "MRI Settled Claims") is allowed in the amount of $20,000,000.

[*Id.*]. Thus, Defendants seemingly convinced the bankruptcy court to accept their position that ASARCO, LLC was arguably liable under the Partnership Agreement and received $38,779,255 as a result of these claims.

At this time, the Court declines to rule as a matter of law which, if any, of these concepts apply but regardless finds that due to its claims in the bankruptcy court, Montana Resources is either estopped or, at the very least, has created an issue of material fact. Consequently, summary judgment is not warranted where Defendants themselves have created an issue of fact by taking inconsistent positions in their filings.

## ii. *ASARCO Master's Rights Pre-Bankruptcy*

Next, Defendants claim that ASARCO Master was never a partner under the Partnership Agreement because AR Montana and ASARCO Master did not merge. [Doc. No. 284 at 18]. Defendants additionally allege that, regardless of the purported merger, AR Montana and ASARCO Master failed to comply with the transfer provisions of the Partnership Agreement and

consequentially ASARCO Master acquired no rights to the Partnership Agreement pre-bankruptcy. [*Id.*].

### a. Merger of AR Montana and ASARCO Master

Defendants argue that Plaintiffs have not submitted admissible summary judgment evidence proving that ASARCO Master merged with AR Montana, thereby gaining whatever rights AR Montana had under the Partnership Agreement. [Doc. No. 292 at 11]. Defendants conclude that if ASARCO Master was not a partner before the bankruptcy, it cannot invoke the reinstatement provision in the Partnership Agreement. [*Id.*].

In response, Plaintiffs offer testimony from Jorge Lazalde Psihas ("Mr. Lazalde") in his capacity as Executive Vice President-Legal and General Counsel of ASARCO, LLC that the merger between AR Montana and ASARCO Master occurred pre-bankruptcy and conclude that ASARCO Master possessed all of AR Montana's partnership rights. [Doc. No. 288 at 25]. Defendants dispute the admissibility of this evidence because they argue that it is not based on Mr. Lazalde's personal knowledge.[7] [Doc. 292 at 11, 16 n.22]. Plaintiffs also argue that—similar to their estoppel-type argument concerning ASARCO, LLC's pre-bankruptcy rights to the Agreement—Defendants are judicially estopped from claiming that ASARCO Master is not a party to the Agreement because Defendants filed a Proof of Claim, seeking to hold ASARCO Master liable for damages under the Partnership Agreement as a successor to AR Montana. [Doc. 288 at 17 n.9, 19].

In his deposition, Mr. Lazalde testified that AR Montana became ASARCO Master through merger. [Doc. No. 292-1 at 27:7–8]. Mr. Lazalde testified that he has worked for ASARCO since

---

[7] Defendants erroneously cite Federal Rule of Civil Procedure 56(e), which in a previous version of the Federal Rules discussed the personal knowledge requirement. [Doc. 292 at 11, 16 n.22].

"[t]he end of 2009" and that he became General Counsel of ASARCO, LLC on February 28, 2010. [Doc. Nos. 292-1 at 16:1–3; 82 at 1]. Plaintiffs allege that ASARCO Master merged with AR Montana before the bankruptcy action which was filed in 2005. [Doc. No. 288 at 18–19].

Mr. Lazalde's testimony, in its present form, is inadmissible as evidence of any merger because Plaintiffs have not explained how Mr. Lazalde could have personal knowledge of a merger that occurred years before he was employed. *See* FED. R. CIV. P. 56(c)(4). Federal Rule of Civil Procedure 56(c)(4) states:

> An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Since the merger occurred before Mr. Lazalde's employment with ASARCO, LLC, and since Plaintiffs have not explained the source of his knowledge, this Court presumes it comes from business records. Even so, Plaintiffs have failed to provide any business records in proper form to support Mr. Lazalde's contention. Absent some explanation and proof of the source of the witness' knowledge, the Court does not find him to be a competent witness on this topic and refuses to consider Mr. Lazalde's testimony as proffered for purposes of summary judgment on the pre-bankruptcy merger issue.

Nevertheless, Plaintiffs argue that Defendants are judicially estopped from claiming that the merger did not take place because Defendants filed a Proof of Claim against ASARCO Master, asserting that the company merged with AR Montana. [Doc. No. 288 at 19]. As previously stated, a court may apply the doctrine of judicial estoppel where a party (1) attempts to assert a position that is clearly inconsistent with its previous position and (2) has convinced a prior court to accept that previous position. *See Ahrens*, 205 F.3d at 833. In their "Proof of Claim of Montana Resources, Inc. Against ASARCO Master, Inc." ("Proof of Claim"), Defendants stated, "AR

Montana Corporation was subsequently merged into and its liabilities were assumed by Debtor, ASARCO Master, Inc." [Doc. No. 194, Ex. 16 at 14]. As noted above, the Court need not rule as to whether Defendants are judicially estopped at this juncture. It is sufficient to note that, given these statements, this Court cannot grant summary judgment. A genuine issue of material fact exists where Plaintiffs provide evidence that Defendants previously claimed that ASARCO Master is a successor to AR Montana and that the bankruptcy court relied on this assertion.

### b. Transfer of Interest

Defendants allege that even if the AR Montana/ASARCO Master merger occurred, ASARCO Master failed to become a partner because MRI never consented to the transfer and because neither the transferor (AR Montana) nor the transferee (ASARCO Master) complied with the Agreement's prerequisites for transfer of partnership rights. [Doc. No. 284 at 18]. Section 16.02 of the Partnership Agreement governs transfers of partnership rights.[8] Section 16.02 of the Partnership Agreement reads:

> 16.02 <u>Conditions to Transfer.</u> No sale, transfer, or other disposition of a Partner's Partnership Interest shall be effective unless: (i) the transferee, on or before the transfer, agrees in writing to become a Partner in the Partnership and to be bound by all of the terms and conditions of this Agreement; (ii) the transferee on or before such sale, transfer or other disposition agrees in writing to assume all obligations and liabilities of the Partnership with respect to the transferred interests; (iii) the transferring Partner indemnifies the non-transferring Partner from and against any incremental local, federal and state income tax liabilities to the non-transferring Partner or the Partnership resulting from the transfer; (iv) the transfer is in compliance with the provisions of all contracts, permits or licenses to which the Partnership is a party.

[Doc. No. 282-1 at 52–53]. Defendants contend that Plaintiffs did not meet these prerequisites for transfer. [Doc. No. 284 at 18]. Plaintiffs respond that Section 16 of the Partnership Agreement

---

[8] Defendants argue that they needed to approve the addition of a new partner under the terms of the Partnership Agreement. [Doc. No. 284 at 20]. Moreover, Defendants also contend that even if AR Montana correctly transferred rights to ASARCO Master, ASARCO Master was required to agree to the terms of the partnership in writing. Additionally, AR Montana was required to cure all deficits, liabilities, and obligations prior to transfer.

does not apply in the event of a merger because "Section 16 requires a transferring partner to survive the transfer but in a merger . . . the transferring partner does not and cannot survive." [Doc. No. 288 at 18]. Plaintiffs do not cite case law to support this interpretation.

Plaintiffs also cite a number of cases that they claim support the idea that "a merger does not constitute a violation of an anti-assignment clause because a 'merger' does not even constitute a 'transfer' for purposes of an anti-assignment provision." [*Id.* at 17]. The Court disagrees with Plaintiffs' first contention. Plaintiffs cite cases that are distinguishable from the one at hand. First, none of these cases purport to interpret Montana law.[9] Additionally, while each of these cases discusses anti-assignment provisions, none of the various anti-assignment provisions specifically covered the transfer of rights to an affiliate.[10] More importantly, in the present case, while not mentioning mergers, Section 16.01 of the Partnership Agreement does specifically cover a party's transfer to affiliates.[11] Parties may contract around or within the boundaries of various rules of law absent a law stating otherwise. *See Newlon v. Teck Am., Inc.*, 360 P.3d 1134, 1137–38 (Mont.

---

[9] Plaintiffs cite three cases, but do not explain why the court should apply them since they interpret Georgia, Ohio, Tennessee, and North Carolina laws and primarily discuss insurance contracts. *Imperial Enters., Inc. v. Fireman's Fund Ins. Co.*, 535 F.2d 287, 292–93 (5th Cir. 1976) (interpreting Georgia law and holding that a no-assignment clause did not save an insurer from liability after a corporate merger); *Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc.*, No. 2:07-cv-116, 2013 WL 992125, at *20 (S.D. Ohio Mar. 13, 2013) (stating that "under Ohio law, an anti-assignment clause has no effect in the context of a merger because all obligations and rights are automatically conferred upon the new entity and no assignment is necessary"); *Cincinnati Ins. Co. v. Crossmann Cmtys. of N.C.*, No. 4:09-CV-1379, 2013 WL 1282017, at *7 (D.S.C. Mar. 27, 2013) (finding that under Tennessee and North Carolina merger statutes, "the surviving corporation assumes all rights and obligations of the predecessor, taking the 'bad,' such as the predecessor's liability to third parties based on premerger acts and omissions, as well as the 'good'—the predecessor's rights to potential insurance coverage to offset losses arising from the pre-merger acts and omissions.").

[10] *See Imperial Enters.*, 535 F.2d at 219 (discussing an excerpt from the anti-assignment provision of the insurance contract); *Inhalation Plastics*, 2013 WL 992125, at *18–20 (discussing the no-assignment clauses in the two contracts at issue in the case); *Cincinnati Ins. Co.*, 2013 WL 1282017, at *5 (discussing the transfer provision in the insurance contract).

[11] 16.01 Transfer to Affiliates. Either Partner may transfer all of its Partnership Interest to another entity which is an Affiliate of the Partner; provided that the transferring Partner shall reimburse and indemnify the nontransferring Partner for and against any and all capital account deficits, liabilities (environmental or otherwise), obligations, losses, actions, judgments, suits, costs, expenses or disbursements of whatsoever kind or nature that may be imposed on, asserted against or incurred by the nontransferring Partner or the Partnership; provided that no such transfer shall be permitted if it would result in a termination of the Partnership pursuant to Section 708 (b) (1) (B) of the Code. [Doc. No. 282-1 at 52].

2015) (upholding the settlement provision in a contract because, although it conflicted with a state statute governing settlement agreements, there was no provision in the statute explicitly preventing the employer from contracting around it); *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1137 (5th Cir. 1995) (en banc) ("It is axiomatic that when the rules of law are clear, parties may contract within or around their boundaries."). Accordingly, where the parties contemplated transfer of interests to affiliates, included a specific provision on this point in their contract, and have not argued that Section 16 is ambiguous, Plaintiffs' argument on this point falls flat.

While the Court does not necessarily agree with Plaintiffs' contention that Section 16, or at least Section 16.01, of the Partnership Agreement does not apply to mergers, the Court finds that, at the very least, a question of fact remains regarding whether Plaintiffs held rights under the Agreement due to Defendants' prior claims in the bankruptcy case. [*See* Doc. No. 194, Ex. 16 at 14].

Defendants additionally argue that ASARCO Master cannot be a successor-in-interest to the Partnership Agreement because Montana law does not allow a third party to become a partner without the other partner's consent, and "[r]egardless of any purported merger, it is undisputed that MRI never provided consent for ASARCO Master (or ASARCO LLC) to become a partner under the Agreement." MONT. CODE ANN. § 35-10-401(9) (West 2017) ("A person may become a partner only with the consent of all the partners."); [Doc. No. 284 at 18]. Plaintiffs provide no evidence directly disputing the lack of consent; however, Plaintiffs again argue that the Proof of Claim evidence described above compels the conclusion that Defendants should be judicially estopped from claiming that Plaintiffs had no rights to the Agreement pre-bankruptcy.

Indeed, a jury could reasonably conclude that Defendants' Proof of Claim indicates that Defendants did accept the transfer of AR Montana's Partnership Interest(s), notwithstanding

Plaintiffs' alleged failure to comply with the transfer requirements set out in the Agreement. [*See* Doc. No. 194, Ex. 16 at 14]. The Proof of Claim, in relevant part, reads:

> This claim arises from the operations of a partnership, Montana Resources, in which *both MRI and a predecessor to ASARCO Master, Inc. previously held general partnership interests*, and that owned and operated a copper mine in Butte, Montana (the "Butte Mine"). Pursuant to agreements relating to or arising from the ownership and operation of the Butte Mine, MRI has incurred, will incur, or may be required to incur, costs, expenses, liabilities and obligations *for which ASARCO Master, Inc. is legally and contractually required to reimburse MRI.* . . . On April 26, 1989 MRI and ASARCO Incorporated which is now known as ASARCO, LLC, ("ASARCO"), entered into a Partnership Interest Purchase Agreement . . . AR *Montana Corporation was subsequently merged into and its liabilities were assumed by Debtor, ASARCO Master, Inc.* Further references to "AMI" are intended to include both debtor, ASARCO Master, Inc., and its predecessor AR Montana Corporation.

[Doc. No. 194, Ex. 16 at 14–16] (emphasis added). Thus, Defendants have claimed that ASARCO Master is "contractually required to reimburse MRI" and that AR Montana's liabilities were assumed by ASARCO Master. These are clear references to liability under the Partnership Agreement and create, at the very least, a factual dispute as to whether Defendants allowed ASARCO Master into the partnership. As stated above, Plaintiffs contend that Defendants should be estopped from taking a contradictory position where Defendants have previously represented to a court that ASARCO Master assumed rights and liabilities under the Partnership Agreement. [Doc. No. 288 at 19]. While this Court is not prepared at this juncture to grant Plaintiffs' request as a matter of law, similar to the discussion above regarding the Proof of Claim Defendants filed against ASARCO, LLC, the Court cannot grant summary judgment in Defendants' favor where they have previously claimed that ASARCO Master is a party to the Partnership Agreement. Their own pleadings have created, at the very least, a fact issue.

Finally, even if Defendants are correct that AR Montana could not confer (and ASARCO Master could not gain) partnership status without first complying with Section 16 of the

Agreement, Plaintiffs may have held *some* interest in the partnership or its assets pre-bankruptcy.[12]

As the Court stated in its prior Summary Judgment Opinion, the fact that the Partnership Agreement may have been dissolved or that AR Montana's interest may have been diluted prior to the bankruptcy "does not necessarily imply that no other rights concerning that venture existed. One need only remember that the Trustee filed an adversary proceeding based upon this very contract, so the debtor who listed the partnership as being dissolved still believed that certain rights existed by virtue of this contract." [Doc. No. 227 at 24]. Furthermore, as Plaintiffs point out, Defendants filed their Proof of Claim in the bankruptcy case alleging that ASARCO Master was liable as a partner under the terms of the Agreement, making it plausible that Defendants too "still believed that certain rights existed by virtue of this contract." [*See* Doc. Nos. 288 at 19; 227 at 24].

While Montana partnership law prohibits the transfer of a partner's partnership status without the consent of all non-transferring partners, it does not prohibit transfer of other types of partnership interests.[13] Under section 503 of the Revised Uniform Partnership Act, which Montana has adopted, a partner may transfer interests, other than partnership status, to a third party. REV. UNIF. P'SHIP ACT § 503 (UNIF. LAW COMM'N 2015–2016) (stating that a transfer "is permissible" but does not entitle the transferee to "participate in the management or conduct of the partnership's business"; a transferee may receive "distributions to which the transferor would otherwise be entitled."); *see also United States v. Coson*, 286 F.2d 453, 462 (9th Cir. 1961) (holding that a transfer of an interest in a general partnership did not operate to make the appellee a member of

---

[12] Note that this interest, if any, may be limited to the 1.23% limit the Court found in its previous order. [Doc. No. 227 at 33–34].

[13] The Fifth Circuit has also recognized that partners may hold different interests in the partnership beyond a governance or an ownership interest. For instance, in *In re O'Connor*, the Fifth Circuit found that under Louisiana partnership law, a partner may share his interest, but not his status, with a third party without the consent of his partners. *Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 403 (5th Cir. 2001) (finding that although a partner can share his economic interest in the partnership under LA CIV. CODE ANN. art. 2812 (effective Jan. 1, 1981), the appellee/trustee did not sue to recover economic interest; therefore, the district court did not address this issue).

the partnership because a transfer by a partner of an interest in the partnership, while allowed, "does not make the assignee of such interest a partner in the firm"). Thus, under Montana law, Plaintiffs may have some reinstatable interest in the partnership, even if it does not equate to full partnership status.

Moreover, the terms of the Agreement arguably support the idea that Plaintiffs might have a claim to some interest other than partnership status. Section 3 of the Partnership Agreement defines "Partnership Interests" as follows:

> 3. Partnership Interests. For all purposes, including allocating income, making cash distributions, contributing capital and allocating losses, each Partner shall have an interest (each a "Partnership Interest") in and to assets or liabilities of the Partnership and the Partnership shall consist of two classes of partners, designated Class A Partner and Class B Partner. The Partnership Interests of the Partners shall be subject to adjustment, Dilution and Reinstatement as set forth herein.

[Doc. No. 282-1 at 17]. This section describes each partner's interest in the various assets, and liabilities, but makes no mention of voting rights, governance, or other ownership interests. Section 12.01(d)(ii)(B) of the Agreement—the Default, Dilution, and Cure provision—describes how a defaulting partner has its Partnership Interest reduced and how it incrementally loses the right to "exercise voting power and to receive distributions" under the Agreement. The reinstatement provision, on the other hand, describes the possibility that upon curing the default, the defaulting partner can regain voting rights and cash distributions in proportion to the lowest Partnership Interest that it held prior to default. It does not explicitly state that the defaulting partner regains its Partnership Interest—only its "voting power" and its entitlement to receive "cash distributions and other income allocations" in proportion to the lowest Partnership Interest that it held prior to the failure to pay a Cash Call. [Doc. No. 282-1 at 38]. The varying language describing the interests a defaulting partner could lose upon default when compared to the interests it could regain after reinstatement could be read as an indication that different interests within the "partnership

package" may be separated out.

Accordingly, the Agreement itself appears to differentiate between voting rights and cash distributions separate and apart from an actual ownership interest. This partnership agreement fails to clearly enumerate what was lost upon AR Montana's alleged default, and what (if anything) is left for Plaintiffs to regain upon reinstatement. This Court has already held that the default and cure provisions of the Partnership Agreement are ambiguous as a matter of law.[14] Even if the Defendants are correct that Plaintiffs never gained an ownership interest in the partnership, Plaintiffs might have a right to some other reinstatable interest by virtue of the Agreement. As the Court previously ruled, there is a genuine issue of material fact as to the meaning of the reinstatement provision, and there is a dispute of material fact as to whether the parties intended the right to reinstatement to override relevant provisions in Montana law. [Doc. No. 227 at 27].

Given the prior representations made by Defendants in the bankruptcy case and given that the parties have not proven as a matter of law that ASARCO Master is explicitly precluded from holding some other interest under Montana law, this Court finds that an issue of material fact precludes summary judgment on the issue as to whether Plaintiffs held no rights to the partnership or its assets pre-bankruptcy.

### iii. *Post-Bankruptcy Rights*

#### a. *Assumption of Partnership Agreement*

Setting aside the issue of whether the Partnership Agreement is an executory or non-executory contract,[15] Defendants argue that ASARCO Master needed to assume the Partnership

---

[14] Since neither party has suggested so, the Court declines to rule whether Section 3 of the Partnership Agreement is ambiguous as a matter of law at this time.

[15] The parties dispute the proper characterization of any remaining rights under the Partnership Agreement. Under the Bankruptcy Code, a contract is either executory or non-executory. *See Diamond Z Trailer, Inc. v. JZ L.L.C (In re JZ L.L.C.)*, 371 B.R. 412, 417 (B.A.P. 9th Cir. 2007) (describing where to place contracts on the schedules). The claim's classification affects how it is treated in the bankruptcy. *Id.* A non-executory contract is either an asset (such as an option contract) or a liability on the schedules. *See id.* (same). A contract is "executory if at the time of the bankruptcy

Agreement during the bankruptcy proceedings in order to retain rights under the Agreement. [Doc. No. 284 at 20]. Defendants claim that ASARCO Master (and ASARCO, LLC) failed to appropriately assume the Partnership Agreement and consequently neither Plaintiff has any rights to enforce the Agreement post-bankruptcy. [*Id.* at 22]. Specifically, Defendants allege that (1) ASARCO Master could not have assumed the Agreement because it was liquidated, (2) ASARCO Master failed to properly assume the Agreement during the bankruptcy proceedings because it did not pay or make a "firm commitment" to pay any delinquent payments, (3) ASARCO Master likewise never provided any notice that it intended to assume the Agreement, and (4) Plaintiffs cannot claim that they received the partnership as an asset because any such assets would have gone to Mark Roberts, the Plan Administrator, under the plan. [Doc. No. 284 at 21].

Defendants' first argument on this point regarding ASARCO Master's alleged liquidation will be addressed in Part (iii)(b) *infra.* Defendants' second and third arguments, that ASARCO Master failed to provide notice that it intended to assume, nor did it properly assume the Agreement during the bankruptcy proceedings because it did not cure or make a "firm commitment" to cure any delinquent payments, are predicated on the assumption that there was a default that needed curing in the first instance. Defendants cite 11 U.S.C. § 365(b)(1)(A)–(C), which outlines the steps a debtor must take to assume an executory contract in default. [Doc. No. 284 at 21]. The Code

---

filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Phoenix Expl., Inc. v. Yaquinto (In re Murexco Petroleum, Inc.)*, 15 F.3d 60, 62 (5th Cir. 1994). "A contract is not executory if the only performance required by one side is the payment of money." *Ocean Marine Servs., Inc. v. Digicon, Inc. (In re Digicon, Inc.)*, No. 03-20121, 2003 WL 21418127, at *5 (5th Cir. June 11, 2003). The Court previously held that "the distinction between an executory contract and an option contract is difficult to delineate. The alleged right to reinstatement has certain features that could lead one to characterize it as either." [Doc. No. 227 at 16]. Notably, ASARCO Master listed a "Joint Venture Agreement" with MRI on its Schedule G, "Executory Contracts and Unexpired Leases," which may indicate that ASARCO Master believed the Partnership Agreement to be an executory contract. [*Id.* at 20]. Nevertheless, the parties have not provided any new information that would allow the Court to more definitively classify the Partnership Agreement as a matter of law. As such, the Court again declines to classify the Partnership Agreement as executory or non-executory at this summary judgment stage.

states,

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
>> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;
>>
>> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>>
>> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1)(A)–(C). Plaintiffs do not dispute that they (or the Trustee) failed to comply with this statute. Nevertheless, in their previous filings, Defendants argued that that they cured Plaintiffs' default. [Doc. No. 176 at 50]. If Defendants cured Plaintiffs' default, then there was no default for ASARCO Master or the Trustee to cure (or commit to cure) post-bankruptcy. Plaintiffs, on the other hand, claim that they are still in default. [Doc. 190 at 60–61]. If Plaintiffs are still in default, then an argument exists that ASARCO Master was required to promptly cure (or commit to cure) the default. As the Court stated in its prior Summary Judgment Opinion, "[o]ne of the main factual disputes in this case is whether Defendant MRI's 'cures' remedied AR Montana's default on the contract." [Doc. No. 227 at 24]. Accordingly, a fact issue again precludes the Court from granting summary judgment as to whether ASARCO Master was required to cure the default in order to properly assume the Partnership Agreement.

Last, Defendants offer the deposition of Mark Roberts, the Plan Administrator, as proof

that ASARCO Master failed to assume the Partnership Agreement as an asset. [Doc. No. 284 at 20]. In his deposition, Mr. Roberts stated that he did not assign "anything" to ASARCO, LLC under the terms of the Bankruptcy Plan,[16] and that he does not recall whether he assigned or transferred the partnership asset to ASARCO Master.[17] Plaintiffs respond that "Defendants have not established through undisputed facts their factual predicate that the Partnership Agreement was not in fact assumed pursuant to Section 8.01 of the Confirmed Plan." [Doc. No. 288 at 24 n.13]. Plaintiffs contend that these deposition excerpts merely establish that

> Mark Roberts: (1) did not authorize the November 15, 2011 reinstatement demand in this litigation; (2) did not list "Montana Resources" or "Montana Resources Inc." in one exhibit to a funds flow memorandum; (3) has "no belief one way or the other" regarding whether the Confirmed Plan provided for assumption of the Partnership Agreement; and (4) did not take any actions regarding the "Montana Resources Partnership" at the time ASARCO Master's bankruptcy case was closed.

[*Id.*]. The Court agrees that this evidence is not dispositive. After reviewing the evidence in the record including the previously discussed admissions in the bankruptcy record, the Court finds that an issue of fact remains regarding whether Plaintiffs appropriately assumed the Partnership

---

[16] Question: All right. Did you as plan administrator under the Parents Seventh Amended Plan transfer or assign any rights in the Montana Resources General Partnership to ASARCO, LLC?
[objection by Mr. Hayes, Mr. Roberts' counsel]
Answer: I mean, the only assets involved in this case that I have been involved in is the cash that's been sent back to ASARCO, LLC from just the normal plan administration, but I haven't been assigning anything to anybody. [Doc. No. 282-14 at 7–8].
[17] Question: Did you take any actions with respect to the assets of ASARCO Master, Inc. following August the 26th, 2012 which is the date of the final decree?
[objection by Mr. Hayes]
Answer: Not that I'm aware of. [Doc. No. 282-14 at 9–10].
. . .
Q: Were you advised by reorganized ASARCO to take any actions with respect to the ASARCO Master, Inc. assets prior to closure of the case?
A: No. [Doc. No. 282-14 at 14].
. . .
Q: Do you know if you had made cure payments on all of the contracts that were required to be paid as cure payments at the time that the various cases were closed that are referenced in this order?
A: I don't recall.
Q: Were you acting in accordance with the plan in closing the various cases?
A: Yes.
Q: Were you taking any actions with respect to Montana Resources Partnership at the time this order was entered?
A: No, I haven't been involved in that transaction at all. [Doc. No. 282-14 at 74].

Agreement.

### b. Partnership Agreement Ride Through

Although the Court again declines to classify the Partnership Agreement as a matter of law, it will address Defendants' "ride through" doctrine arguments because, contrary to the Defendants' position, both executory and non-executory contracts can "ride through" bankruptcy. Defendants argue that it is impossible for the Partnership Agreement to have passed through bankruptcy for three reasons: (1) neither ASARCO, LLC nor ASARCO Master possessed rights under the Agreement pre-bankruptcy, and the ride through doctrine cannot create rights that did not exist pre-bankruptcy; (2) ASARCO Master was liquidated under the plan and agreements cannot ride through a liquidated entity; and (3) "a contract that purportedly rode through the bankruptcy case, instead of being assumed, would not 'cure' a default in the agreement premised on the filing of bankruptcy." [Doc. No. 284 at 24]. Each of these arguments turns on a question of fact, and the relevant facts are disputed.

The court in *In re JZ L.L.C.* discussed the applicability of the ride through doctrine to executory and non-executory contracts in a debtor's bankruptcy estate. 371 B.R. 412, 425 (B.A.P. 9th Cir. 2007) (discussing whether the ride through doctrine survived amendments to the Bankruptcy Code). There are three choices a trustee of a debtor's bankruptcy estate may make with an executory contract: assumption, rejection, or no action. If the trustee takes no action or cannot take any action, "a contract may 'ride through'" the bankruptcy. COLLIER ON BANKRUPTCY ¶ 365.03[6] (16th ed. 2015). In *In re JZ L.L.C.*, the court explained that the ride through doctrine allows a contract to continue in effect where there was a failure to affirmatively assume or reject an executory contract. 371 B.R. at 423. The court then pointed out that "the boundary between executory and non-executory is vague." *Id.* Contracts that are non-executory need not be assumed

to remain in effect and are typically disclosed as assets or liabilities in bankruptcy. *Id.* at 425. Thus, the court concluded, executory and non-executory contracts may ride through bankruptcy, notwithstanding rejection or failure to provide notice. *See id.*

Following a Chapter 11 bankruptcy, the Fifth Circuit in *In re O'Connor* determined that a partnership agreement was an executory contract, not assumable under Louisiana law, but rode through the bankruptcy. 258 F.3d 392, 405 (5th Cir. 2001). The parties did not dispute whether the contract was executory, and the panel adopted that characterization. *Id.* at 400. The court determined that the partnership agreement was neither assumed nor rejected because the wording in the bankruptcy plan implied "that something more than plan-confirmation is necessary for assumption," and the necessary steps were not taken. *Id.* at 401. The court then held that the contract was not assumable because it fell into the exception in 11 U.S.C. § 365(c)(1), which provides,

> The trustee may not assume or assign any executory contract. . .of the debtor, whether or not such contract. . .prohibits or restricts assignment of rights or delegation of duties, if. . .applicable law excuses a party, other than the debtor, to such contract. . .from accepting performance from or rendering performance to an entity other than the debtor . . .and . . .such party does not consent to such assumption.

258 F.3d at 402 (ellipses in the original). In other words, even where the agreement itself restricts a partner's ability to transfer its partnership rights, the assumable-nature of the contract is subject to "applicable" (i.e., state) law. *See id.* (applying Louisiana partnership law).

Defendants' first argument—that ASARCO Master cannot be reinstated under the Partnership Agreement because it was never a party to the Agreement—is discussed above in Part (IV)(A)(ii). As stated above, the Court finds that there is a factual dispute regarding whether AR

Montana merged with ASARCO Master.[18]

Next, Defendants argue that it is impossible for the Partnership Interest to have passed through bankruptcy because even if ASARCO Master and AR Montana merged, ASARCO Master was liquidated under the Bankruptcy Plan. [Doc. No. 284 at 19, 24]. Plaintiffs disagree, stating that the Supplemental Confirmation Plan allowed the debtor/Trustee to delay or modify the wind down procedures. [Doc. No. 288 at 25]; [Supplemental Confirmation Plan, Adv. No. 05-21207, Doc. No. 13369]. Plaintiffs offer Mr. Lazalde's declaration as evidence that ASARCO Master was never wound down. [Doc. No. 288 at 25]. In his declaration Mr. Lazalde stated,

> Pursuant to the Supplemental Confirmation Order, ASARCO LLC did not wind down ASARCO Master, Inc. or its assets, thus preserving both ASARCO Master, Inc.'s claims against Defendants and ASARCO LLC's ownership interest in ASARCO Master, Inc. Also pursuant to the Supplemental Confirmation Order, ASARCO LLC has not transferred the assets of ASARCO Master, Inc. to any third party, instead allowing such assets to revest in reorganized ASARCO Master, Inc.

[Doc. No. 82 at ¶ 18].

The Court finds this evidence admissible. While Mr. Lazalde cannot (without further elucidation) testify to any decision-making that occurred prior to his employment in late 2009, he can testify that ASARCO Master was in existence in late 2009 when he began working and remains in existence today. The existence of the company is, at the very least, circumstantial evidence that the company was not wound down or liquidated prior to his tenure. The Court denies summary judgment on this point.

Defendants' final argument, that "a contract that purportedly rode through the bankruptcy case, instead of being assumed, would not 'cure' a default in the agreement premised on the filing of bankruptcy," refers to Section 11(d) of the Partnership Agreement. [Doc. No. 284 at 24]. Section

---

[18] Additionally, the doctrine of judicial estoppel may prevent Defendants from claiming that ASARCO Master was never a party to the Partnership Agreement. See discussion in Part (IV)(A)(ii) *supra*.

11(d) states that a voluntary petition for bankruptcy is an act of default; thus, Defendants argue, even if the Court finds that Plaintiffs or Defendants cured or had the right to cure the Section 11(a) (Cash Call) default, a default under Section 11(d) is incurable and would prohibit Plaintiffs' reinstatement. [Doc. No. 282-1 at 41].

As previously stated, Defendants are correct that filing for bankruptcy is an act of default; however, the effect of that default remains unclear. Again, the Partnership Agreement controls; Section 12.01 states:

> 12.01 Default; Dilution; Cure. Upon the occurrence of an Event of Default pursuant to Section 11(a) [failure to make Cash Calls] or 11(d) [filing for bankruptcy], or if there is no dispute or there has been a final determination regarding an Event of Default pursuant to Section 11(b) or 11(c), and failure to cure as set forth herein, the Partner in default, or in the case of an Event of Default pursuant to Section 11(b), any purported transferee of such Partner's Partnership Interest (the "Defaulting Partner"):
>> (a) shall have *no further right to participate in the management and control of the Partnership*;
>> (b) *shall not*, nor shall its members or their representatives on the Management Committee, *have voting rights until a Reinstatement or a cure has occurred*;
>> (c) *shall receive no allocation of income nor cash distributions from the Partnership until a Reinstatement* or cure has occurred. The loss of such income during the period of Event of Default is waived and non-recoverable even if a Reinstatement or cure shall occur;
>> (d) The filing of a voluntary petition by a Partner or the filing of an involuntary petition against a Partner that is not discharged within thirty days, under any bankruptcy or insolvency law.

[Doc. No. 282-1 at 41–42] (emphasis added). Thus, as is clear from the express language, a bankrupt partner loses its rights to (1) participate in management and control, and (2) exercise its voting rights or to receive an allocation of income or cash. [*Id.*]. It does not lose its "Partnership Interest" unless it is diluted under Section 12.01(d)(ii)(B), and even that is subject to whatever reinstatement rights are conferred by Section 12.02. According to the Partnership Agreement, a partner who has defaulted due to bankruptcy has the right to be reinstated. In sum, these provisions

essentially require this Court to find that a fact issue exists, as it has with all other arguments requiring an analysis of the interplay between Sections 11 and 12.

Indeed, Section 11(a) (describing default upon failure to meet the Cash Calls) and Section 11(d) (describing default upon petition for bankruptcy) are two paths that converge at the same point; both default provisions require the Court to interpret Section 12, the reinstatement provision. The Court has already held that Section 12 of the Partnership Agreement is ambiguous; therefore, this final argument also presents a factual issue. [Doc. No. 227 at 29–30]. This is especially true given the position Defendants took in the bankruptcy court filings.

As the Court pointed out previously, it "cannot conclude as a matter of law that AR Montana was in default, given that Defendants now have taken the position that they cured the defaults and given the drafting flaws in the contract." [Doc. No. 227 at 24].

**B. Partnership Agreement Drafts**

Finally, Defendants contend that two newly discovered drafts of the Partnership Agreement make the meaning of the default clause "clear and unambiguous" because these newly discovered drafts rectify the internal inconsistencies in the final Partnership Agreement. [Doc. No. 284 at 2]. According to Defendants, "[t]he newly discovered drafts of the Agreement . . . eliminate any possible ambiguity and confirm Plaintiffs have no reinstatement right" because the earlier drafts show that AR Montana's then-counsel committed a "drafting error when revising the April 21, 1989 draft to create the near final April 24, 1989 draft." [*Id.* at 2, 10]. In its previous order, the Court found that the final draft of the Partnership Agreement contains "dead ends"[19] and these dead ends make the default and cure clause ambiguous as a matter of law; under Defendants' theory, these dead ends were caused by a failure to renumber sections in successive drafts after

---

[19] *See* Part (I)(A) *supra* ("The references to 'Section 12.01(a) or Section 12.01(b)(i)' were incorrect—Section 12.01(a) does not refer to deeming a partner to be in default and Section 12.01(b)(i) does not exist.").

AR Montana's then-counsel incorporated proposed edits. [*Id.* at 11–12]. Defendants claim that by comparing the new drafts to the final version, one can see to which sections the "dead end" references were meant to refer. [*Id.* at 10]. Plaintiffs respond that the language is still ambiguous and argue that the new drafts do not elucidate, at least as a matter of law, the parties' intent. [Doc. No. 288 at 16]. While these two drafts of the Partnership Agreement certainly lend credence to Defendants' interpretation of the contract, the drafts do not render the final contractual language unambiguous as a matter of law.

Under the Montana law governing contract interpretation, "[t]he whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." MONT. CODE ANN. § 28-3-202 (West 2015). "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." *Id.* § 28-3-401. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible," subject to other statutory requirements. *Id.* § 28-3-303. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." *Id.* § 28-3-301.

"[W]hether an ambiguity exists in a contract is a question of law." *Mary J. Baker Revocable Tr. v. Cenex Harvest States, Coops., Inc.*, 164 P.3d 851, 857 (Mont. 2007). The Montana Supreme Court has held that "[a]n ambiguity exists when the contract language, taken as a whole, could reasonably be given two different meanings." *Krajacich v. Great Falls Clinic, LLP*, 276 P.3d 922, 928 (Mont. 2012). In interpreting a contract, "if the court finds the language to be unambiguous, then the plain language of the contract will govern, and the court can look no further;" however, "[i]f the court finds that contract language is ambiguous, it may consider extrinsic or parol evidence to resolve the ambiguity." *Anaconda Pub. Schs., Bd. of Trs. of Anaconda Sch. Dist. No. 10 v.*

*Whealon*, 268 P.3d 1258, 1262 (Mont. 2012). Ambiguity is an objective standard. *Mary J. Baker*

*Revocable Tr.*, 164 P.3d at 857.

As the Court held in its previous order, the reinstatement provision is ambiguous as a matter

of law. In its prior Summary Judgment Opinion, the Court reasoned:

> The dilution and reinstatement provisions on their face are plausibly open to both interpretations posited by the parties: that a defaulting party can reinstate after the non-defaulting party has cured its defaults or that a defaulting party is prohibited from doing so. It is plausible that the use of the word "cure" in both the dilution and reinstatement provisions demonstrates that, if a non-defaulting partner cures the defaulting partner's default, the defaulting partner would have no default left to cure. It is also plausible that a non-defaulting partner's cure of the "Event of Default" in Section 12.01(d)(ii)(B) is different from the "cure" of "default" listed. While these two drafts of the Partnership Agreement seem to support the Defendants' interpretation of the contract, the drafts do not render the contractual language unambiguous as a matter of law in Section 12.02, so that the defaulting partner may still be in default despite the fact that the non-defaulting partner has cured the "Event of Default."

[Doc. No. 227 at 29–30] (internal citations omitted). The Court then reviewed the extrinsic and

parol evidence pursuant to Montana law, but was still unable to find an undisputed interpretation

of the contract.

> None of the summary judgment evidence provides any undisputed insight into the intent of the parties in drafting this contract provision. The only person on record actively involved in the negotiations testified that he could not remember the specific intent behind individual provisions, but only the general intent of the agreement.

[Doc. No. 227 at 30].

Defendants argue that these two newly discovered drafts provide undisputed insight into

the intent of the parties. [Doc. No. 284 at 4]. Defendants explain that "[t]hrough a combination of

continued searching and fortuity," they were able to locate drafts of the Partnership Agreement.

The two drafts, dated April 21, 1989, and April 24, 1989, were found in an off-site storage unit.[20]

---

[20] The final, signed version of the Partnership Agreement was dated May 31, 1989. [Doc. No. 282-1 at 1].

[*Id.* at 3]. Defendants state that "[t]he newly discovered April 21st draft shows that the parties meant for a reinstatement right to arise only in the event that the non-defaulting party (MRI) chose" to either "decline to act" or "transfer an amount to cover the deficit and deem that transfer an advance to the Defaulting Partner." [Doc. No. 284 at 3].

Defendants point out that the language in Section 12.02 of the April 21st Draft is almost identical to Section 12.02 of the executed Agreement.[21] Section 12.02 in the April 21st Draft and Section 12.02 in the executed version both point to the same subsections in their explanation of "default" under the terms of the Agreement. Defendants give weight to this similarity because "[u]nlike in the executed version of the Agreement . . . those references are *not* dead ends," but instead detail the range of options the non-defaulting partner may take. [Doc. No. 282 at 12].

Defendants attempt to demonstrate that in the April 21st Draft, the references to 12.01 in Section 12.02 properly align with their corresponding subsections. [Doc. No. 284 at 12]. Section 12.02 of the April 21st Draft refers to subsections 12.01(a) and Section 12.01(b)(i) as follows:

> **April 21st Draft:**
> 12.01 <u>Default; Dilution; Cure</u>. Upon the occurrence of an Event of Default pursuant to Section 11(a) or 11(d), or if there is no dispute or there has been a final determination regarding an Event of Default pursuant to Section 11(b) or 11(c), and failure to cure as set forth herein, the Partner in default . . . shall have no further right to participate in the management and control of the Partnership. . . .
>> *(a) The Non-Defaulting Partner may decline to act and the Defaulting Partner shall be deemed to be, and to remain, in default until the Non-Defaulting Partner shall waive such default in writing;*
>> *(b) The Non-Defaulting Partner may transfer an amount adequate to cover the deficit amount of the Cash Call and:*
>>> *(i) deem such transfer to constitute an advance to the Defaulting partner of such deficit amount, which advance shall not cure the Event of Default. . . .*
> 12.02 <u>Reinstatement.</u> In the event that a Non-Defaulting Partner shall elect that the Defaulting Partner shall be deemed to be in default pursuant to *Section 12.01(a) or Section 12.01(b)(i)*, the Defaulting Partner may cure such default by contributing all amounts owed to the Non-Defaulting Partner and the Partnership, which repayment shall constitute reinstatement ("Reinstatement"). After Reinstatement,

---

[21] Except for the word "lowest" in the last sentence.

such Partner (a "Reinstated Partner") (a) shall possess the voting power on the Committee that it held with respect to its lowest Partnership Interest prior to the failure to pay a Cash Call and (b) shall be entitled to receive cash distributions and other income allocations in proportion to the Partnership Interest that it held prior to the failure to pay a Cash Call.

[Doc. No. 282-3 at 40, 42] (emphasis added). The problem allegedly arose when White & Case attorneys incorporated the parties' edits into the April 24th Draft, which Defendants claim required renumbering and re-lettering Section 12.01. [Doc. No. 284 at 13]. As evidence of the drafting error, Defendants provide an affidavit from Dennis E. Lind, MRI's lawyer during the drafting and negotiation of the Partnership Agreement. [Doc. 282, Ex. 2 at 1]. Mr. Lind states that the drafters relabeled and renumbered the sections after incorporating edits to the April 21st Draft, but forgot to update the references elsewhere in the contract. [*Id.*]. "White & Case relabeled the subsections of 12.01 referenced in Section 12.02—which had been Sections 12.01(a) and 12.01(b)(1)—as Sections 12.01(d)(i) and 12.01(d)(ii)(A)." [Doc. No. 284 at 14]. As a result, Defendants argue, the April 24th Draft failed to accurately enumerate the specific set of circumstances under which a partner may be reinstated under the terms of the Agreement. [*Id.* at 2]. The April 24th Draft reads:

**April 24th Draft:**
12.01 Default; Dilution; Cure. Upon the occurrence of an Event of Default pursuant to Section 11(a) or 11(d), or if there is no dispute or there has been a final determination regarding an Event of Default pursuant to Section 11(b) or 11(c), and failure to cure as set forth herein, the Partner in default . . .
    (a) shall have no further right to participate in the management and control of the Partnership;
    (b) shall not, nor shall its members or their representatives on the Management Committee have voting rights until a Reinstatement or a cure has occurred;
    (c) shall receive no allocation of income nor cash distributions from the Partnership until a Reinstatement or cure has occurred. The loss of such income during the period of Event of Default is waived and non-recoverable even if a Reinstatement or cure shall occur . . .
    *(d) shall be subject to any of the following remedies, at the discretion of the Partner not in default (the-"Non-Defaulting Partner") at any time during the event of Default and prior to Reinstatement or cure:*
        *(i) The Non-Defaulting Partner may decline to act and the*

> *Defaulting Partner shall be deemed to be, and to remain, in default until the Non-Defaulting Partner shall waive such default in writing;*
>
> *(ii) The Non-Defaulting Partner may transfer an amount adequate to cover the deficit amount of the Cash Call and:*
>
>> *(A) deem such transfer to constitute an advance to the Defaulting Partner of such deficit amount, which advance shall not cure the Event of Default . . .*
>
> 12.02 <u>Reinstatement.</u> In the event that a Non-Defaulting Partner shall elect that the Defaulting Partner shall be deemed to be in default pursuant to *Section 12.01(a) or Section 12.01(b)(i)*, the Defaulting Partner may cure such default by contributing all amounts owed, plus interest at the Overdue Rate, to the Non-Defaulting Partner and the Partnership, which repayment shall constitute reinstatement ("Reinstatement"). After Reinstatement, such Partner (a "Reinstated Partner") (a) shall possess the voting power on the Committee that it held with respect to its lowest Partnership Interest prior to the failure to pay a Cash Call and (b) shall be entitled to receive cash distributions and other income allocations in proportion to lowest Partnership Interest that it held prior to the failure to pay a Cash Call.

[Doc. No. 282-4 at 41, 43] (emphasis added). Defendants explain that this drafting error remained incorrect in the final, executed Agreement (dated May 31, 1989). [Doc. No. 284 at 14].

Defendants contend that Mr. Lind's declaration and the accompanying April 21st and April 24th Drafts resolve the ambiguous nature of the reinstatement provisions because they show the drafting error that led to the errant references, and consequentially demonstrate that the parties only intended that a defaulting partner be able to cure if the non-defaulting partner chose to act in accordance with Sections 12.01(d)(i) and 12.01(d)(ii)(A). [*See id.*]. While certainly persuasive, the Court's prior opinion has not changed; the default and cure provision of the Partnership Agreement is ambiguous. The two newly discovered drafts certainly provide some insight into the parties' intent in drafting this provision and what caused the ambiguity; however, the Court cannot weigh competing evidence at this stage in the litigation.

Accordingly, despite the discovery of the two drafts and Mr. Lind's explanation, a genuine issue of material fact remains.

## V. CONCLUSION

Defendants have failed to show that there is no genuine dispute as to any material fact or that they are entitled to judgment as a matter of law. While Defendants are no doubt correct that by filing for bankruptcy, AR Montana/ASARCO Master defaulted under Section 11(d) of the Partnership Agreement, the consequences that result due to default depend upon the interpretation of the ambiguous default and reinstatement provisions. Notwithstanding the newly discovered drafts of the Partnership Agreement and the affidavit of Mr. Lind, fact issues remain as to the meaning of the default and cure provisions, and whether Plaintiffs have a right to reinstatement under the terms of the Agreement. Fact issues also remain concerning whether AR Montana and ASARCO Master merged prior to bankruptcy and whether, as a result of this merger, ASARCO Master is able to be reinstated under the terms of the Partnership Agreement. Relatedly, Defendants' own filings have created questions with regard to whether ASARCO, LLC or ASARCO Master are similarly able to be reinstated under the terms of the Partnership Agreement. Finally, issues remain as to what type of interest, if any, must be reinstated—a 1.23% partnership (ownership) interest or a 1.23% interest of a different kind.

For the aforementioned reasons the Court hereby **DENIES** Defendants' Post-Discovery Motion for Summary Judgment [Doc. Nos. 282 (redacted version) & 284 (filed under seal)] on all grounds.

IT IS SO ORDERED.

Signed this 15 day of January, 2019.

Andrew S. Hanen
United States District Judge